ZACHARY A. AVALLONE
DANIEL J. BALL
Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
100 F Street, N.E.
Washington, D.C. 20549
(202) 551-4479 (Avallone)
(202) 551-5987 (Ball)
AvalloneZ@sec.gov
BallDan@sec.gov

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>             Plaintiff,<br><br>     v.<br><br>ERIC L. MUNSON; ADIT VENTURES MANAGEMENT, LLC; ADIT VENTURES, LLC; ADIT VENTURES II, LLC; and ADIT VENTURES III, LLC,<br><br>             Defendants. | Civil Action No. 1:26-cv-06800<br><br>JURY TRIAL DEMANDED |

**COMPLAINT**

Plaintiff Securities and Exchange Commission ("SEC" or "Commission"), for

its Complaint against Defendants Eric L. Munson ("Munson"), Adit Ventures

Management, LLC ("Adit Ventures Management"), and certain General Partners—

Adit Ventures, LLC ("Adit Ventures I"), Adit Ventures II, LLC ("Adit Ventures II"),

and Adit Ventures III, LLC ("Adit Ventures III")—alleges as follows:

1

## SUMMARY

1.    From at least April 2019 through December 2024 ("Relevant Period"), investment adviser Eric Munson acting through and on behalf of Adit Ventures Management and the Defendant General Partners, offered and sold interests in private funds ("Funds"). Munson solicited investors by offering access to shares of stock of certain private, pre-IPO companies—investments that, if the company were sold or went public, could trigger a liquidity event resulting in a significant payout to investors.

2.    ***Misrepresentations to Induce Investments.*** In certain instances, Defendants resorted to false claims and promises to persuade some investors to contribute capital to the Funds. In one case, Munson secured more than $15 million from an investor by falsely claiming that an investment vehicle he controlled already owned shares of a certain pre-IPO company stock, when at that point the vehicle did not hold any shares. And in another example, Munson persuaded an investor to contribute $5 million into a Fund by falsely claiming that he would invest $5 million of his money personally into the Fund.

3.    ***Misuse of Fund Capital.*** Defendants told investors that they needed to contribute capital immediately in order for Defendants to seize on near-term pre-IPO investment opportunities for the Fund. But Defendants did not always deploy investor capital immediately as promised. Instead, Defendants used capital received from investors for their own purposes and for other Funds' benefit, sometimes by misappropriating money directly and other times by taking unsecured loans from Funds on terms favorable to Defendants and the borrowing Funds compared to

interest rates generally available to the borrowers at the time. These loans were generally not authorized by Fund limited partnership agreements or limited liability company agreements ("Fund Agreements") or otherwise, and Defendants rarely disclosed these loans to the Funds or investors.

4.    ***Markups and Unauthorized Fees.*** Defendants violated their fiduciary duties and the trust owed to their clients and defrauded investors by misrepresenting Defendants' actual cost to acquire pre-IPO shares, structuring transactions to benefit themselves at the expense of their clients, and causing Funds to make unauthorized payments to General Partners.

5.    The scheme often worked like this: a General Partner would use capital borrowed from a client Fund through an unauthorized and undisclosed loan (as described above) or sometimes its own money to buy shares of target pre-IPO company stock. The General Partner or its affiliate would then cause a client Fund to buy those shares at a higher price, with Defendants pocketing the difference. In many instances, Defendants also misrepresented the true cost of acquiring those shares to investors, deceptively inflating the reported "Original Purchase Price" to conceal the markup. Defendants separately charged an "Acquisition Fee," even when Fund Agreements did not authorize such a fee or when Defendants sometimes represented in a side letter or subscription agreement that they would not charge an Acquisition Fee.

6.    These transactions were not permitted under Defendants' agreements with their client Funds or investors, breached Defendants' fiduciary duties and

3

representations, and violated applicable federal securities laws when executed without disclosure and consent. This pattern reoccurred during the Relevant Period and allowed Defendants to earn tens of millions in unauthorized fees and profits.

7.      ***Pledging Client Fund Assets as Collateral.*** When two General Partners that Munson majority-owned needed capital to meet their own obligations, Munson arranged for these General Partners to obtain a line of credit. In order to obtain the line of credit for these General Partners, Munson improperly pledged multiple Funds' assets as collateral by transferring millions of shares owned by client Funds, putting investor assets at risk. The line of credit and asset impairments were not disclosed to the impacted Funds or investors. Munson later restructured the line of credit to remove Fund assets as collateral.

8.      ***Failure to Register with the SEC.*** Adit Ventures Management failed to register as an investment adviser, which meant that it was not subject to regular SEC examinations and therefore could engage in the scheme described above with a lower risk of detection.

9.      ***Defendants Breached their Fiduciary Duties to Client Funds.*** Each Defendant is an investment adviser as defined in 15 U.S.C. § 80b-2(a)(11). Defendants thus owed fiduciary duties to act in the best interests of their client Funds, which consists of a duty of loyalty and a duty of care.

10.     The duty of loyalty requires Defendants to exercise the utmost good faith in dealing with their clients, to disclose all material facts fully and fairly, and to employ reasonable care to avoid misleading their clients. The duty to disclose all

4

material facts includes the duty to disclose all conflicts of interest that might incentivize the adviser to render investment advice that is not disinterested. To satisfy the duty of loyalty, an investment adviser who does not eliminate a conflict of interest with his or her advisory client must make an adequate disclosure of such conflicts of interest to the client and obtain the client's informed consent to the conflict.

11.    The duty of care includes the duty to provide advice that is in the best interest of the client, based on the client's objectives, and to provide advice and monitoring over the course of the advisory relationship.

12.    Defendants breached these fiduciary duties on those occasions when they misappropriated Fund capital to enrich themselves, repeatedly bought pre-IPO shares only to sell those same shares at inflated prices to their client Funds, concealed the markups by reporting misleading Original Purchase Prices in Fund documents, charged undisclosed and unauthorized fees, and used multiple client Fund assets as collateral for third-party loans.

13.    ***Defendants Engaged in Fraud.*** The allegations in this Complaint describe material misrepresentations made to Fund investors. The allegations also outline Defendants' scheme to defraud investors, and how the transactions, practices, and courses of business operated as a fraud or deceit upon the investors in the Funds.

## JURISDICTION AND VENUE

14.    This Court has jurisdiction over this action under Section 22(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77v(a)], Section 27(a) of the

5

Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78aa(a)], and Section 214(a) of the Investment Advisers Act of 1940 ("Advisers Act") [15 U.S.C. § 80b-14(a)].

15. Defendants, directly and indirectly, have made use of the means or instrumentalities of interstate commerce or of the mails in connection with the transactions, acts, practices, and courses of business alleged in this Complaint.

16. Venue lies in this district under Securities Act Section 22(a) [15 U.S.C. § 77v(a)], Exchange Act Section 27(a) [15 U.S.C. § 78aa(a)], and Advisers Act Section 214(a) [15 U.S.C. § 80b-14(a)] because certain of the acts, practices, and courses of conduct constituting violations of the federal securities laws occurred within this district. Defendants reside within this district.

## DEFENDANTS

17. **Eric L. Munson**, age 65, is a resident of New York, New York. Munson is a co-founder of Adit Ventures Management and is listed as the Chief Executive Officer, Chief Investment Officer, and Chief Compliance Officer on Adit Ventures Management's Form ADVs filed with the SEC from April 11, 2016, to the present. He owns over 75% of Adit Ventures Management either directly or through entities he controls. He also owns at least 70% of each of the General Partners and the General Partners are under his control. During the Relevant Period, Munson was an investment adviser as defined in 15 U.S.C. § 80b-2(a)(11).

18. **Adit Ventures Management, LLC** (f/k/a PSP Ventures Management, LLC) is a Delaware limited liability company with its principal place of business in New York, New York. Adit Ventures Management operated as an

exempt reporting adviser from April 11, 2016, to March 29, 2024, when it registered as an investment adviser with the Commission. During the Relevant Period, Adit Ventures Management managed between $123 million and $563 million in regulatory assets under management across at least 60 client Funds. In its Form ADV filed on March 31, 2026, Adit Ventures Management reported that it had around $465.9 million of regulatory assets under management. Adit Ventures Management is under common control with affiliated general partners—Adit Ventures I; Adit Ventures II; and Adit Ventures III—which all have delegated investment advisory responsibilities and activities to Adit Ventures Management. During the Relevant Period, Adit Ventures Management was an investment adviser as defined in 15 U.S.C. § 80b-2(a)(11).

19.    **Adit Ventures, LLC; Adit Ventures II, LLC; and Adit Ventures III, LLC** ("General Partners") are Delaware limited liability companies, each with a principal place of business in New York, New York. They served as general partners for Funds organized as limited partnerships or managing members for Funds organized as limited liability companies. The General Partners were empowered by the Fund Agreements to conduct all activities on behalf of the Funds. Each of the General Partners delegated all investment advisory responsibilities and activities as the Funds' primary adviser to Adit Ventures Management, and thus to Munson. During the Relevant Period, the General Partners were investment advisers as defined in 15 U.S.C. § 80b-2(a)(11).

## OTHER RELEVANT ENTITIES

20.     **Investor A** is a firm that invests on behalf of retail and institutional investors. Among other investments, Investor A contributed over $15 million to a special purpose vehicle called Fika Holdings SPV III, LP, which was advised and managed by Adit Ventures III, and thus by Munson.

21.     **Investor B** is a trustee-administered retirement plan for an individual and his family members. Among other investments, Investor B contributed $5 million to Adit Growth Equity II, LLC, which was managed by Adit Ventures III, and thus by Munson.

## FACTS

### I.     Overview of Defendants' Business

22.     During the Relevant Period, Defendants offered and sold interests in their private, pooled investment vehicles—the Funds—which were promoted as vehicles to secure and hold equity positions in private companies before those companies went public (pre-IPO companies). The Fund interests that Defendants sold were securities.

23.     Pre-IPO shares are often held by early-stage investors and private company employees and thus are seldom available to the investing public. Pre-IPO equities appeal to investors because they can deliver high returns if the company's public offering share prices are higher than the cost of acquiring pre-IPO shares.

24.     During the Relevant Period, Defendants managed over 60 Funds, which included more than 1,000 investors. Defendants offered investments in three types of Funds: (1) single-stock Funds, which were structured as limited

partnerships invested in a single pre-IPO target company; (2) diversified Funds, which pursued investment in multiple pre-IPO target companies and usually could invest no more than 10 percent of its capital in any one pre-IPO company; and (3) co-invest Funds, in which existing investors could gain additional exposure to a single pre-IPO company.

25. The Funds were structured either as limited partnerships with a Defendant General Partner serving as the general partner or as limited liability companies ("LLCs") with a Defendant General Partner serving as the managing member. Single-stock Funds were organized as limited partnerships, while diversified Funds and co-invest Funds were LLCs. Defendant General Partners served as general partners or managing members to multiple Funds. Each of the General Partners delegated all Fund investment advisory responsibilities and activities to Adit Ventures Management.

26. In nearly all cases, investors sent money to the Funds with the expectation that their investment would be pooled with other investors' capital. The Funds were structured so that investors would participate in any profits along with other investors in each Fund. The investors in each Fund were passive investors.

27. Each of the Fund Agreements state that the General Partner shall use Fund "credit and assets solely for the benefit" of the Fund.

28. The single-stock and co-invest Funds were structured to wind down in the event the target company consummated an initial public offering. At that point, or soon thereafter, the Fund would either distribute shares of the target company in

kind to investors or the Fund would sell the shares and distribute the proceeds pro rata. In any event, remaining Fund assets and cash would be allocated and distributed among the investors and the General Partner according to a waterfall as outlined in the Fund Agreements.

29.    The diversified Funds were set to wind down by a particular date, but the term could be extended under certain circumstances. Diversified Funds could distribute proceeds in cash or target company stock, with any remaining Fund assets allocated and distributed among the investors and the General Partner according to a waterfall as outlined in the Fund Agreements.

30.    Munson controlled Adit Ventures Management's management and operations during the Relevant Period, including directing financial transactions, approving loans, setting pricing for investor share interests, and causing Funds to pay fees to General Partners. Munson solicited investors on behalf of the Funds. Munson was also responsible for negotiating and signing Fund Agreements, subscription documents, and side letters with investors.

31.    Munson, acting through Adit Ventures Management and Defendant General Partners, also advised clients on when and how to invest in pre-IPO companies, and to make investment decisions on their behalf. He also sourced pre-IPO shares and share interests, including from company employees, secondary market platforms, third-party funds, and sometimes directly from pre-IPO companies.

### II.    Defendants' Multi-Pronged Scheme

32.    Munson, acting through Adit Ventures Management and the General Partners, coordinated a scheme on Funds and investors by: (1) soliciting investments through misrepresentations and false promises; (2) requiring investors to immediately invest capital that Defendants then misappropriated or loaned to themselves; (3) using loans from Funds and Defendants' own capital to buy pre-IPO shares, only to turn around and immediately sell those shares to their client Funds at higher prices, charging markups and collecting hidden fees not disclosed or permitted by the Fund Agreements; and (4) arranging for a $10 million line of credit for two Defendant General Partners, transferring custody of millions of pre-IPO shares held by client Funds as collateral. Each step of this scheme is explained below.

### a.    Defendants Induced Investments with Misrepresentations and False Promises

33.    Defendants solicited investors through email, in-person meetings, and through their website. When Defendants found a potential investor willing to commit capital to their Funds, they sometimes resorted to misstatements and false promises to close the deal. Here are two examples.

### 1.    Defendants Obtained a $15 Million Investment by Falsely Claiming to Own 32,000 Shares of Klarna

34.    In the fall of 2020, Munson falsely told Investor A that a special purpose vehicle called Fika Holdings SPV III, LP ("Fika Holdings SPV III") owned 32,000 shares of Klarna Holding AB ("Klarna") stock. That false claim induced

11

Investor A to commit more than $15 million—the largest single investment that Adit Ventures Management had ever received.

35.    In September 2020, Investor A emailed Munson asking about his access to Klarna stock. Munson responded that he could "source additional $20mm at the latest round price."

36.    On October 9, 2020, Investor A told Munson that it had "a $10mm buyer for Klarna . . . please advise if you have the needed allocation." Munson confirmed: "We can execute this trade." A few days later, Investor A told Munson it wanted to increase its purchase of Klarna stock and was looking to invest around $15 million. The parties continued discussions through October 2020 and ultimately settled on a price of $475 per share of Klarna stock.

37.    Munson, however, misled Investor A about his access to Klarna shares. From at least September 2020, Munson had discussed sourcing Investor A's Klarna shares from a venture capital firm ("Share Seller A"). But by mid-October, Share Seller A told Munson that it had "decided not to sell [Klarna] shares to any external investors for the time being." So by at least October 23, 2020, Munson knew that his planned direct source for Investor A's Klarna shares was no longer an option, but Munson did not tell Investor A.

38.    On October 28, 2020, Munson told an Adit Ventures Management Vice President to draft a Share Transfer Agreement purporting to show Fika Holdings SPV III had an agreement to acquire 32,000 shares of Klarna stock at $475 per share (exactly the amount and price Investor A requested). Munson instructed  the

Vice President to "redact the seller" and identify the purchaser as Fika Holdings SPV III. Munson had the redacted Share Transfer Agreement sent to Investor A as purported proof that Fika Holdings SPV III had bought the desired Klarna shares.

39.    Adit Ventures Management emailed Investor A's Managing Partner, attaching a side letter, subscription documents, and a Fund Agreement. The side letter was signed by Eric Munson on behalf of the Fund's General Partner, Adit Ventures III. The Fund Agreement made clear that the General Partner was responsible for "all aspects of the Partnership's business and operations."

40.    The side letter explained that Investor A was investing $15,000,000 to acquire a corresponding interest in "FIKA HOLDINGS SPV III, LP, **which owns shares in Klarna**" (emphasis added). But that statement was false because Fika Holdings SPV III did not actually own shares in Klarna at the time the letter was sent or at the time it was executed.

41.    It was important to Investor A that Fika Holdings SPV III owned the 32,000 Klarna shares at the time of its investment. Generally, Investor A does not invest in vehicles that do not own the underlying assets. If Investor A knew that Fika Holdings SPV III did not actually own the Klarna stock, it likely would not have invested.

42.    Investor A executed the subscription documents for Fika Holdings SPV III, signed the side letter, and wired around $15 million to the Fund's General Partner, Adit Ventures III, based on its understanding that Investor A was buying

a direct interest in 32,000 shares of Klarna stock through its investment in Fika Holdings SPV III for $15,000,000 plus an agreed-upon management fee.

43.    Given his involvement in sourcing pre-IPO stock for Fika Holdings SPV III, Munson knew—or was reckless or negligent in not knowing—that the representations to Investor A about Fika Holdings SPV III owning 32,000 Klarna shares were false.

44.    Throughout the end of 2020 and into 2021, Adit Ventures Management's Vice President repeatedly flagged for Munson that Fika Holdings SPV III did not hold the 32,000 shares of Klarna stock represented to Investor A. That Vice President reminded Munson of this share deficiency "very early in the process" and "pretty often."

45.    Investor A repeatedly asked Adit Ventures Management for stock certificates to confirm that Fika Holdings SPV III owned the promised 32,000 Klarna shares. Munson often failed to respond to those inquiries or provided misleading excuses for why he did not yet have certificates for the 32,000 Klarna shares. In any event, Munson did not tell Investor A that Fika Holdings SPV III did not hold the promised Klarna stock.

46.    Investor A did not learn of the share deficiency until almost one year later. When the truth emerged, Investor A was shocked. On October 26, 2021, for example, Investor A's General Counsel emailed Munson:

> It has come to my attention that . . . you informed [Investor A] for the first time that, despite our agreement, understanding, and your prior representations to us, the FIKA SPV may not hold 32,000 shares (the 'Klarna Shares') of Klarna Holding AB ('Klarna'). If true, that news would be a

14

complete shock to us. Among other things, we have always understood that the FIKA SPV purchased the Klarna Shares on or about October 30, 2020, and that FIKA SPV continues to hold those Klarna Shares. . . . Also disturbing is the fact that after we closed the FIKA SPV transaction and prior to your recent outreach, you continued to pitch [Investor A] additional deals, never once mentioning this potential issue.

47.     Munson, Adit Ventures Management, and Adit Ventures III, as the General Partner of Fika Holdings SPV III, misled and worked to deceive Investor A by failing to disclose that Fika Holdings SPV III did not hold the claimed Klarna shares at the time of the investment and concealing the share deficiency for nearly a year. These actions also breached Munson's, Adit Ventures Management's, and Adit Ventures III's fiduciary duties to Fika Holdings SPV III.

48.     Munson knew—or was reckless or negligent in not knowing—that Fika Holdings SPV III did not hold the shares as promised and knew about the deficit all along.

49.     As described below, Munson also knew—or was reckless or negligent in not knowing—that the $15 million that Investor A had contributed was not used immediately to buy Klarna stock because Defendants borrowed millions from Fika Holdings SPV III in unauthorized loans rather than buying Klarna stock as promised.

50.     As the founder, majority owner, and CEO of Adit Ventures Management, who acted on behalf of Adit Ventures Management with respect to the conduct alleged, Munson's knowledge and state of mind are imputed to Adit Ventures Management and in turn to Adit Ventures III. However, after Investor A

15

threatened legal action, Defendants eventually acquired the full 32,000 shares for Fika Holdings SPV III before the Klarna IPO.

### 2. Munson Falsely Promised that He Would Invest $5 Million Alongside Investor B

51. As another example, Adit Ventures Management pitched Investor B around August 2021 on participating in the Adit Growth Equity II, LLC Fund ("AGE II"), a diversified Fund which was to be managed by Defendant Adit Ventures III. As part of the pitch, Adit Ventures Management promised that Munson would invest around $5 million in AGE II alongside Investor B's contribution of $5 million.

52. Investor B explicitly asked Munson for confirmation that "the total fund size [would] be $10mm and that Eric [Munson] (or his vehicle) would be investing the balance[.]" Munson replied, confirming that "the Fund [would] consist of [Investor B's] and Eric's capital of approximately $10mm."

53. Ultimately, Investor B contributed $5 million in AGE II, executing the Fund subscription documents around September 30, 2021, and wiring its investment to AGE II's account around October 1, 2021.

54. Munson, however, did not personally invest $5 million in AGE II alongside Investor B, as agreed. Nearly two years later, Investor B learned that Munson had not invested $5 million as agreed and raised the issue with him. Munson eventually contributed to AGE II, but, as of September 2025, had only invested about half of the $5 million that he had agreed to invest.

16

55.    Munson's promise to invest $5 million was material to Investor B's decision to invest in AGE II. Munson knew that Investor B was looking for Munson or his affiliated entities to contribute $5 million to the AGE II Fund, which Munson expressly agreed to do.

56.    Munson knew—or was reckless or negligent in not knowing—that his commitment to invest $5 million was false because he did not timely invest $5 million into AGE II.

57.    As described further below, not only did Munson not immediately contribute $5 million as promised, but he also knew—or was reckless or negligent in not knowing—that AGE II did not even have all of Investor B's capital available to invest because Munson, acting through AGE II's General Partner, used Investor B's $5 million for unauthorized purposes and loans.

58.    As the founder, majority owner, and CEO of Adit Ventures Management, who acted on behalf of Adit Ventures Management with respect to the conduct alleged, Munson's knowledge and state of mind are imputed to Adit Ventures Management and in turn to Adit Ventures III.

### b.    Defendants Misused Fund Assets

#### 1.    Defendants Misappropriated Investor B's $5 Million

59.    Munson, Adit Ventures Management, and Adit Ventures III deceived and misled Investor B and breached their fiduciary duties to client Fund AGE II by using Investor B's $5 million investment for their own benefit.

60.    Before transferring money, Investor B asked Munson why AGE II needed to be fully funded up front rather than over time through periodic capital

17

calls. Investor B asked: "Would suitable opportunities be immediately available for all of the amounts invested? If not, can I suggest that the contributions are drawn down periodically (which should be straightforward here as there will be only two investors) to avoid cash being unused?"

61. Munson replied that Adit put its "capital to work within 30 days, typically, we thereby see no need for capital calls over a period of time." Investor B explained that it did not want "amounts invested [to sit] in cash for extended periods" and asked Munson to confirm that he had "$10mm+ of relevant opportunities more or less ready to go." Munson replied: "[w]e have plenty of ideas for $10m capacity in AGE II." Based on assurances of immediate investment opportunities and the promise of Munson's matching contribution, Investor B sent $5 million to AGE II's General Partner Adit Ventures III on October 1, 2021.

62. Around the time that Munson was finalizing Investor B's $5 million investment, Munson signed a stock transfer agreement for Defendant Adit Ventures III—the General Partner of AGE II—to buy 294,117 shares of stock in pre-IPO company Flexport, Inc. for $4,999,989. The seller gave Adit Ventures III until October 1, 2021 to pay for the shares.

63. The problem was Adit Ventures III's bank account did not have enough money to pay for those Flexport shares. At the start of October 2021, its account had a balance of only around $4,283. To make up the difference, Defendants directed Investor B to wire its $5 million investment for AGE II.

18

64.     When Investor B's $5 million arrived in Adit Ventures III's account on October 1, 2021, Munson immediately directed Adit Ventures III to use that money to pay for Flexport shares to meet the seller's deadline. The following is an excerpt from a text chain involving Munson and two employees from October 1, 2021:

> Vice President: We haven't received the funds from [Investor B]. It's 5:24 pm in the UK so I'm assuming it's not coming today
>
> Vice President: With that being said, we are in a sticky situation with flexport. They gave us a final deadline today
>
> Vice President: I don't know what to do at this point. I told the company we would fund today
>
> Munson:     Please tell them the facts. We can show them the emails (redacted) [sic] stating the wire was sent & apologies. It might have gone to the old account from old fund docs . . . Can we check w the bank on the old instructions?
>
> Munson:     Call [individual] to ask them to help us find our $5m wire at the bank?
>
> Employee 1: The wire came!!
>
> Vice President: Ahhhh
>
> Vice President: Thank you [Employee 1]!!



Munson: Hahaha. Yes I'm very relieved as well. . . .

19

65.    About a month later, Adit Ventures III sold those Flexport shares for around $6.8 million—netting about $1.8 million in gross profit.

66.    Neither Munson, Adit Ventures Management, nor Adit Ventures III shared any of the profits from that Flexport transaction with AGE II, even though AGE II's money—straight from Investor B—provided the capital, and the AGE II subscription document and side letter specifically identified Flexport as a potential investment opportunity.

67.    Investor B was not informed by Defendants that its $5 million contribution was not actually used to fund AGE II, but instead used by General Partner Adit Ventures III to finance a short-term investment in Flexport shares for the benefit of the General Partner and not AGE II.

68.    Munson's request that Investor B fully fund its AGE II capital commitment immediately while intending to use Investor B's $5 million to generate profits for himself and General Partner Adit Ventures III would have been material to Investor B's decision to invest in AGE II.

69.    Munson knew—or was reckless or negligent in not knowing—that Adit Ventures III planned to use Investor B's $5 million AGE II investment for its own benefit. Munson signed the stock transfer agreement on behalf of Adit Ventures III, he negotiated the $5 million capital contribution from Investor B, and he directed Adit Ventures III to take Investor B's $5 million and use it to pay for the Flexport shares.

70.    As the founder, majority owner, and CEO of Adit Ventures Management, who acted on behalf of Adit Ventures III with respect to the conduct alleged, Munson's knowledge and state of mind are imputed to Adit Ventures Management and in turn to Adit Ventures III.

### 2.    Defendants Took Loans from Their Client Funds

71.    For years, Defendants' business operations were financed through unauthorized loans from client Funds.

72.    Defendants repeatedly caused their client Funds to provide unsecured intercompany loans, including: (1) Fund-to-General Partner loans, in which General Partners borrowed from Funds for the General Partner's benefit; and (2) Fund-to-Fund loans, in which one Fund loaned money to another Fund for the borrowing Fund's benefit. These loans would sometimes be used to buy pre-IPO shares on behalf of Defendant General Partners, who then sold those shares to their client Funds allowing Defendants to profit from markups or unauthorized fees (as described more below).

73.    Defendants generally documented the loans through "Intercompany Demand Notes" ("Notes"). These Notes were always signed by Munson on behalf of at least one party and Munson often signed on behalf of both the borrower and the lender.

74.    ***Client Fund-to-General Partner Loans.*** During the Relevant Period, Defendant General Partners misused tens of millions of dollars of client and investor money through more than 50 loans. Defendants borrowed money from client Funds to finance investments in pre-IPO shares that Defendants would then

21

sell back to client Funds for a profit. On at least two occasions, Defendants also used loans from their client Funds to cover Adit Ventures Management's operating costs.

75. The terms of these loans benefited Defendants to the detriment of their client Funds because the loans were on terms that were much more favorable to Defendants than otherwise available in the market.

76. The loans were not authorized by the Fund Agreements or otherwise by clients. They did not advance the stated purposes of the Funds. And these loans put Fund capital at risk in the event of a default because the loans were unsecured and used to invest in equity securities (among other things).

77. These loans conflicted with what Defendants told investors about how their capital would be used—to invest in pre-IPO securities—and violated the Fund Agreements provision that the General Partner would use "the Partnership's credit and assets solely for the benefit of the Partnership."

78. Here is an example. As described above, in October 2021, Adit Ventures III misappropriated Investor B's $5 million for a short-term investment in shares of Flexport stock. In November 2021, Adit Ventures III transferred $5 million to AGE II's account (while keeping $1.8 million profit from the Flexport sale). But the same week the $5 million was transferred to AGE II's account, Adit Ventures III borrowed $5 million from AGE II through two loans—one loan for $4 million and another for $1 million—which again removed Investor B's entire $5 million capital contribution from AGE II.

79. Munson signed the Notes for both loans on behalf of the borrower (Adit Ventures III) and lender (AGE II).

80. These loans were not used to advance the stated purpose of AGE II, which was "to purchase, hold for investment and ultimately divest shares of capital stock of each Target Company . . . and to conduct such other activities as are necessary for or ancillary to such purposes and objectives." Instead, Adit Ventures III used Investor B's $5 million to buy shares of pre-IPO company stock which it then sold to other client Funds (profiting in part through unauthorized Acquisition Fees).

81. While the Notes for these two loans purported to give AGE II six percent annual interest—a rate Adit Ventures III could not obtain in the market—Adit Ventures III did not repay the principal for one of those loans until October 2023 (nearly two years later), and AGE II received no interest payments for years while the principal was outstanding. Even though Munson requested that Investor B contribute $5 million to AGE II in October 2021 based on assurances that the money would be put to work buying shares and interests in pre-IPO companies, Investor B's full $5 million was not actually available for AGE II's use for the years Defendants' loan was outstanding.

82. Munson also knew that Investor B did not want its money used for loans because Investor B had recently rejected Munson's pitch to contribute to a credit fund where profits would have come from loaning out invested capital.

23

83.     Many of the Fund-to-General Partner loans involved a General Partner taking loans from a Fund that it did not manage. For example, in July 2021, General Partner Adit Ventures I borrowed around $2.2 million from Astra Holdings SPV III, LP (whose General Partner was Adit Ventures III).

84.     The terms of loans that General Parters took from client Funds were not comparable to loans that any General Partner or Adit Ventures Management could obtain from third parties.

85.     For General Partners, borrowing cash from client Funds was less expensive than available third-party loans, which generally required collateral, charged large upfront fees, and imposed a higher interest rate. For instance, as explained more below, two General Partners obtained financing from a third party in 2023 at an interest rate of 17 percent—far higher than the six percent rate that they paid for loans from their client Funds in prior years. These third-party loans to General Partners imposed fees and required significant collateral, while the loans taken from client Funds had no fees and were unsecured.

86.     ***Fund-to-Fund Loans.*** During the Relevant Period, Defendants also caused the Funds to engage in at least three Fund-to-Fund loans, totaling $1.1 million. Fund-to-Fund loans were sometimes executed in two legs—Fund-to-General Partner loan and then General Partner to another Fund.

87.     After Investor A invested $15 million in Fika Holdings SPV III, for example, Munson directed Fika Holdings SPV III to loan $4 million to its General Partner, Adit Ventures III, in December 2020. Adit Ventures III, in turn, loaned $4

million to a different Fund, Equitas Holdings SPV, LP. At no time did Defendants disclose to Fika Holdings SPV III or Investor A that the invested capital was used to finance stock purchases for a different Fund rather than purchasing Klarna shares.

88.    Both Client Fund-to-General Partner and Fund-to-Fund loans breached the Fund Agreements and the General Partners' fiduciary duties because the terms of these loans were structured to benefit the borrowers, not the lending client Funds.

89.    The client Funds had less ability to quickly respond to pre-IPO opportunities because the loans reduced Fund liquidity by millions of dollars for years at a time. These loans also exposed the Funds' capital to risk in the event of default because the loans were not secured by collateral.

90.    Defendant General Partners did not always promptly return the loaned principal, in some cases not repaying for years. In 2021, for instance, Adit Ventures I borrowed more than $10.2 million from Ethos Holdings SPV LP. Adit Ventures I did not pay interest for more than two years, and at least $400,000 of principal was not paid back until December 2023.

91.    General Partners also did not make timely or regular interest payments. In nearly a third of the more than 50 loans where the Fund was the lender, interest was not paid until at least one year later, and in some cases, Defendants paid no interest for more than three years. During that time, interest did not compound on the unpaid amounts.

92.     Munson knew—or was reckless or negligent in not knowing—that these loans benefited Defendants to the relative detriment of the client Funds.

93.     As the founder, majority owner, and CEO of the company, who acted on behalf of the Defendants with respect to the conduct alleged, Munson's state of mind is imputed to Adit Ventures Management and in turn to the General Partners.

### c.     General Partners Extracted Profits from Client Funds Through Unauthorized Markups and Fees

94.     Rather than using invested Fund capital to buy shares of pre-IPO companies for the Fund directly, Defendant General Partners regularly took loans from Funds to buy shares of pre-IPO company stock and then resold those shares to their client Funds at a higher price.

95.     The Advisers Act prohibits advisers like Defendant General Partners from selling securities to their own client Funds without written disclosures and valid consent. Advisers Act Section 206(3) prohibits each General Partner from "acting as principal for [its] own account, knowingly to sell any security to or purchase any security from a client, . . . knowingly to effect any sale or purchase of any security for the account of such client, without disclosing to such client in writing before the completion of such transaction the capacity in which he is acting and obtaining the consent of the client to such transaction."

96.     From April 2019 to November 2023, Defendants engaged in more than 150 transactions in which General Partners sold pre-IPO shares to client Funds without disclosing to client Funds in writing before the completion of each

transaction the capacity in which the General Partner was acting and obtaining the consent of the client Fund to each transaction.

97.    Not only did Defendants not disclose or receive consent for these transactions under the Advisers Act, but Defendants also breached their fiduciary duty by purchasing shares at one price and then selling the shares to their client Funds at a higher price. In many instances, they also misled investors about the actual costs of acquiring the pre-IPO shares.

98.    Here is an example of how this worked. In the summer of 2021, Munson had the opportunity to buy an interest in a third-party fund holding shares of SpaceX at a price of around $420 per share of SpaceX. In July 2021, Fund Astra Holdings SPV, LP acquired an interest equivalent to around 13,100 SpaceX shares for $420 per share. Part of that purchase was made with $1.2 million borrowed from Fund Ethos Holdings SPV, LP on June 30, 2021 (as noted above, a loan that was not fully repaid for nearly two and a half years).

99.    Acting through the Fund's General Partner Adit Ventures I, Munson caused Astra Holdings SPV, LP, which owned interest in the 13,100 SpaceX shares, to assign its interest in those SpaceX shares to the Fund's General Partner, Adit Ventures I, at cost—$420 per share.

100.    By the end of July 2021, General Partner Adit Ventures I had sold an interest equal to those same 13,100 SpaceX shares to a new client Fund, Astra Holdings SPV III, LP, for around $498.00 per share—netting a profit of $78 per share. Adit Ventures I kept the resulting profit of around $1,020,000.

27

101.    In this example, Defendants breached their fiduciary duties and the Advisers Act's disclosure and consent requirements on both sides of the transaction. They violated the Advisers Act when they caused Astra Holdings SPV, LP to sell its interest in SpaceX shares to its General Partner at cost without disclosure and consent. And they violated it again when the General Partner sold the interest in SpaceX shares for a profit to client Fund Astra Holdings SPV III, LP without disclosure and consent.

102.    Defendants' actions also were a part of a scheme to defraud Funds and investors by failing to disclose the fact that Defendants profited from hidden markups. Defendants misled the Funds and investors by claiming that the General Partners would not receive payments unless authorized by the Fund Agreements when they were actually obtaining undisclosed payments from client Funds through hidden markups. And, as explained below, Defendants misled their client Funds and investors by reporting a misleading "Original" price without disclosing that they were making a profit from these markups.

103.    Like most Agreements for single-stock Funds in this case, Astra Holdings SPV, LP's Agreement limited payments made to its General Partner—including fees and expenses—to four categories: (1) a carried interest distribution; (2) an annual management fee; (3) Acquisition Fees, under certain defined circumstances; and (4) reimbursement of partnership expenses paid by the General Partner and consistent with the Agreement. Other than these four categories, "the Partnership does not intend to pay the General Partner any additional amounts."

28

Diversified Fund Agreements limited payments to General Partners to only (1) a carried interest distribution; (2) an annual management fee; and (3) reimbursement of certain expenses—those Agreements did not allow Defendants to charge Acquisition Fees. Co-Invest Fund Agreements provided for a one-time management fee and did not permit Acquisition Fees.

104.    Defendants advertised transparency to potential investors through email and in marketing materials. For example, when responding to a potential investor's inquiry, an Adit Ventures Management agent responded: "All fees and expenses expected to be incurred are mentioned in our docs. We are as transparent as possible with our accounting, aligning our own interests with our LP's."

105.    The single-stock Fund Agreements, including the Fund Agreement for Astra Holdings SPV III, LP allowed the General Partner to assess an "Acquisition Fee" but only in limited circumstances: "In the event that the price per share at which the Partnership pays for Target Company Stock (the '***Original Purchase Price***') shall be less than the Investor Price, the Partnership shall pay the General Partner . . . the difference between the Investor Price and the Original Purchase Price." Under Fund Agreements, the Investor Price was the price per share of Target Company Stock that an investor paid to buy an interest in the Fund and the baseline price that would be used to calculate an investor's pro rata distribution.

106.    The Astra Holdings SPV III, LP Agreement set the Investor Price at $498 per share of SpaceX, so the Fund could pay an Acquisition Fee to the General

Partner only if Astra Holdings SPV III, LP's Original Purchase Price was lower than $498 per share.

107.    Defendants told Astra Holdings SPV III, LP investors in the subscription agreement that the "Original Purchase Price" was "$498.00 per share." But the truth was that Defendants paid only $420 per share of SpaceX stock and charged the Fund $498, a difference of $78 per share. By claiming that Original Purchase Price was the same as the Investor Price but deceptively omitting the truth that Defendants actually paid $420, Defendants concealed what they paid for these SpaceX shares and received payments from markups without disclosing those payments to their client Fund or investors.

108.    Like the Astra Holdings SPV III, LP subscription agreements, many other Fund Agreements signed by investors also listed the Original Purchase Price and the Investor Price as the same—meaning that an investor would have understood based on the Defendants' representations: (1) that the Fund was paying the actual cost to acquire the shares, (2) that no Acquisition Fee would be assessed, and (3) that the General Partners would receive no payments beyond the enumerated list of permissible costs and fees. But in a number of cases, what Defendants disclosed as the Original Purchase Price to investors was higher than what Defendants actually paid for the shares, concealing that General Partners were taking profits not authorized by the Agreements.

109.    Here are a few other examples. Defendants extracted millions in payments by purchasing shares of Esme Learning Solutions LLC stock and selling

to their client Funds at a higher price on the same day. For instance, in late April 2020, Defendant Adit Ventures purchased 40 shares of Esme stock for $25,000 per share and the same day sold Esme shares to a client Fund called Nephos Holdings SPV for $40,000 per share. That same week, Investor B invested $1 million in Nephos Holdings SPV to buy an interest in 25 shares of Esme. Investor B's subscription documents stated that the "Original Purchase Price" for Esme stock was $40,000 per share, which concealed that Defendants bought Esme stock and resold it at a higher price to Nephos Holdings SPV.

110.    Defendants also profited millions of dollars through markups of shares of Animoca Brands Corporation Limited. On or around September 23, 2020, for example, Defendant Adit Ventures I bought 2,000,000 shares of Animoca stock at an average price of less than $0.08 per share. That same day, Adit Ventures I sold 1,000,000 shares to diversified Fund AGE II for $0.10 per share—a difference of around $20,000. And in June 2021, Adit Ventures I bought Animoca shares for around $0.86 per share and by July 6, 2021, sold 80,000 shares to a client Fund called Metamorphose Holdings SPV LP for $1.25 per share—a difference of around $31,000.

111.    In all these examples Defendants sold these shares to their own client Funds without disclosure or consent. Defendants were on both sides of the transaction, so they set the Original Purchase Price that was represented to investors.

112.   These examples are not isolated occurrences but representative of the widespread practice of Defendants charging unauthorized and undisclosed markups. By reporting a misleading Original Purchase Price, Defendants could hide the fact they were inflating the price of pre-IPO shares and receiving payments that were not authorized by Fund Agreements or disclosed to Funds and investors. Defendants' misleading claims induced investors to contribute more capital in exchange for Fund interests representing fewer shares.

113.   The accurate disclosure of the true original cost of the shares and related payments to General Partners were material. Defendants obtained undisclosed payments from clients in breach of their fiduciary duties and at the expense of client Funds. Investors reasonably expected all fees and payments to be disclosed in the underlying Agreements and in any corresponding investor statements and would have wanted to know about hidden fees and payments affecting their investments.

114.   Besides marking up pre-IPO shares when selling to their client Funds, Defendants also charged Acquisition Fees to Funds when Fund Agreements and side letters did not allow them to do so.

115.   Defendants charged Acquisition Fees to co-invest Funds and diversified Funds even though those Agreements did not allow Defendants to charge Acquisition Fees. The Agreement for Adit Growth Equity III, LLC, for example, stated that the Fund "does not intend to pay the Managing Member [Adit Ventures II] or the Investment Manager [Adit Ventures Management] any additional

32

amounts" other than (1) carried interest distribution, (2) a management fee, and (3) reimbursement of certain expenses under the Agreement. Despite these clear terms, Defendants still charged unauthorized Acquisition Fees for investments made by Adit Growth Equity III and other diversified Funds.

116.  Co-invest Funds were touted as an opportunity for an investor to invest in shares of a specific company's stock. Co-invest Fund Agreements set a one-time management fee and allowed no other payments to the General Partner manager. But Defendants sometimes invested capital from co-invest Funds into single-stock Funds, paying themselves Acquisition Fees. Defendant Adit Ventures I, for example, was not permitted to collect any payments or fees from capital contributed to Adit Growth Equity III Co-Invest LLC beyond a one-time, 1% management fee. But Defendant Adit Ventures I caused Adit Growth Equity III Co-Invest LLC to invest in single-stock Fund Vista Holdings SPV, LP, which allowed Adit Ventures I to collect more than $600,000 in Acquisition Fees through the single-stock Fund. Defendants charged Acquisition Fees related to investments from other Co-Invest Funds as well.

117.  In other cases, Defendants agreed in side letters not to charge Acquisition Fees. For example, Investor A signed a side agreement with Defendants to buy $4.4 million worth of partnership interests in Equitas Holdings SPV, LP equivalent to 400,000 shares of Social Finance stock. That letter stated that there would be no fees beyond a one-time management fee and specifically stated that "without limitation, there shall be no (i) Acquisition Fee pursuant to Section 9.3 of

33

the Partnership Agreement." Despite this clear language, Adit Ventures III, the General Partner of Equitas Holdings SPV, LP, collected more than $400,000 in Acquisition Fees related to Investor A's investment.

118. Many Fund Agreements and related subscription documents listed the Original Purchase Price and Investor Price as the same, so Defendants would not be entitled to pay themselves any Acquisition Fees under the Fund Agreements. But they still did in many cases.

119. Investor B, for example, invested $2 million in Evexia Holdings SPV, LP, in March 2021. The subscription documents listed an Investor Price of $38 per share of Noom, Inc. stock and an "Original Purchase Price Per Share" of "$38.00 per share." Because the Investor Price and Original Purchase Price were the same, the Fund Agreement did not allow the General Partner to take an Acquisition Fee. But the General Partner still charged the Fund over $50,000 in Acquisition Fees related to Investor B's investment in Evexia Holdings SPV.

120. As another example, certain Equitas Holdings SPV, LP subscription documents listed both the Original Purchase Price and Investor Price as the same, meaning that the Fund would not be charged an Acquisition Fee. But the Defendant General Partner still took millions in Acquisition Fees from Equitas Holdings SPV, LP. And certain Vista Holdings SPV, LP subscription agreements similarly claimed the Original Purchase Price was the same as the Investor Price, yet the Defendant General Partner charged that Fund millions in Acquisition Fees, as well.

34

121. By collecting unauthorized Acquisition Fees, the General Partners reduced Fund assets and cash that would otherwise be available for distribution to investors.

122. By collecting undisclosed and unauthorized markups and fees, Defendants breached their fiduciary duties to the Funds and defrauded underlying Fund investors. As investment advisers, Defendants had a duty to disclose all material facts to their clients about how General Partners and their affiliates would be compensated, such as through fees, carried interest, markups, or some other mechanism. They breached these duties to clients and defrauded investors by providing misleading disclosures and by withholding information from Funds and Fund investors regarding the fees assessed. As noted above, Defendants also took active steps to conceal mark-ups and other payments to which they were not entitled. Nor were the undisclosed and unauthorized markups and fees assessed in Defendants' clients' best interests.

123. Munson directed the purchase and sale of shares, instructed his employees to prepare internal "assignment of interest letters" that reflected these sales, and his name and title were included on these letters.

124. Munson knew—or was reckless or negligent in not knowing—that the General Partners profited from buying pre-IPO shares and then selling them to client Funds with undisclosed markups.

125.    Munson knew—or was reckless or negligent in not knowing—that the Original Purchase Price represented to investors was generally not the actual cost Defendants paid to buy the shares.

126.    Munson knew—or was reckless or negligent in not knowing—that the General Partners charged Acquisition Fees in those circumstances when not allowed under Fund Agreements or when the Original Purchase Price and Investor Price was represented to investors as the same.

127.    As the founder, majority owner, and CEO of the company, who acted on behalf of the company with respect to the conduct alleged, Munson's state of mind is imputed to Adit Ventures Management and in turn to the General Partners.

### d.    Improper Use of Investor Assets as Loan Collateral

128.    After the SEC began to ask about Defendants' practices of taking loans from their client Funds, Munson, on behalf of General Partners Adit Ventures I and Adit Ventures III, secured a $10 million line of credit from a third party ("Lending Firm"). To obtain the loan for General Partners Adit Ventures I and Adit Ventures III, Munson pledged collateral that included multiple client Funds' assets along with General Partner assets. This loan enabled Defendants to pay off outstanding loans owed to client Funds and purchase additional pre-IPO stock.

129.    Around November 2023, Munson contacted the Lending Firm asking about a possible line of credit for Defendant General Partners. Over the next two months, Munson personally negotiated the terms of this facility, providing details

about Funds and falsely claiming that General Partners had a right to pledge Fund assets as collateral.

130. In one email from November 20, 2023, for example, Munson told the Lending Firm that each client Fund allowed its General Partner to borrow against and pledge Fund assets. In another email on December 6, 2023, when asked about the General Partners' ability to enter the loan, pledge Fund interests, and take on leverage, Munson responded, in part: "Yes all [Fund] agreements allow for this as do the operating agreements."

131. In December 2023, Munson, on behalf of Adit Ventures I and Adit Ventures III, entered into two separate custodian agreements for the loan facility. Those loans charged Adit Ventures I and Adit Ventures III an annual interest rate of 17 percent and identified specific Fund assets pledged as collateral.

132. The loan agreement was structured as a collateral sale and buyback under which Defendant General Partners had to transfer millions of pre-IPO shares from client Funds to a custodial account at the Lending Firm. While the loan was outstanding, the lender retained possession and control of those shares. And in the event of a default by Adit Ventures I or Adit Ventures III, the Lending Firm could liquidate the pledged shares of client Funds that it possessed.

133. Neither the client Funds nor the investors in those Funds were informed that Fund assets had been transferred to a third party for Defendants' benefit or otherwise, or that those shares were at risk of liquidation if the General Partner defaulted.

134. Because of Munson's conduct, those Fund assets were encumbered for about a year. Only following the SEC staff's repeated queries about this practice did Defendants repay part of the loan and renegotiate the collateral on the remaining balance to remove the encumbrance.

135. Investors would have wanted to know that Fund assets could be used as collateral given the risks associated with an encumbrance, including risk of total loss if a General Partner defaulted.

136. Investors in the Funds would have also wanted to know that Fund assets were transferred to a third party who had the right to liquidate those assets in the event of a default.

137. Given his involvement in the negotiations for the credit line, Munson knew—or was reckless or negligent in not knowing—that he was encumbering client Fund and investor assets contrary to the Agreements and putting these assets at risk.

138. Munson knew—or was reckless or negligent in not knowing—that Munson's use of client and investor assets as collateral to secure a loan to benefit General Partners at the expense of their own client Funds conflicted with Fund Agreements and interests and conflicted with what Defendants told investors about how Fund assets and credit would be used.

139. As the founder, majority owner, and CEO of the company, who acted on behalf of the company with respect to the conduct alleged, Munson's state of

38

mind is imputed to Adit Ventures Management and in turn to the General Partners.

### III. Adit Ventures Management Failed to Register with the SEC as an Investment Adviser

140. Adit Ventures Management failed to register as an investment adviser despite being required to do so.

141. Section 203 of the Advisers Act [15 U.S.C. § 80b-3] requires investment advisers who engage in interstate commerce to register with the SEC unless an exemption applies.

142. From April 2016 through March 2024, Adit Ventures Management claimed that it was exempt under the venture capital exemption (Advisers Act Section 203(*l*) and Rule 203(*l*)-1) [15 U.S.C. § 80b-3(*l*) and 17 C.F.R. § 275.203(*l*)-1].

143. The venture capital exemption applies only when an adviser acts as an investment adviser solely to venture capital funds. A "venture capital fund," in turn, as defined in the Advisers Act, is a private fund that, among other things, holds no more than 20 percent of the fund's aggregate capital contributions and uncalled committed capital in assets that are not "qualifying investment." Rule 203(*l*)-1(a) [17 C.F.R. § 275.203(*l*)-1(a)]. Qualifying investments are, among other things, equity securities issued by a qualifying portfolio company acquired directly by the private fund. Rule 203(*l*)-1(c)(3) [17 C.F.R. § 275.203(*l*)-1(c)(3)].

144. Adit Ventures Management could not claim the venture capital exemption as it did because it managed funds that did not qualify for the exemption.

145. Munson knew by at least May 2022 that Adit Ventures Management did not qualify for the venture capital exemption. But Adit Ventures Management employees continued to misrepresent Adit Ventures Management's registration status.

146. On May 4, 2022, for example, an employee at Adit Ventures Management emailed a prospective investor, copying Munson, responding to a question about whether Adit Ventures Management intended to continue to rely on the venture capital exemption. The employee responded, in part: "Adit has been an exempt reporting advisor [sic] with the SEC since 2016. Adit has created a culture where compliance is an integral part of everything we do. Adit is in the process of becoming a registered investment advisor [sic] ('RIA') with the Securities and Exchange Commission ('SEC') having instituted a vigorous compliance program with the assistance of a compliance consultant."

147. Despite Munson's awareness of Adit Ventures Management's registration requirements and Adit Ventures Management's representations to investors in May 2022 regarding the steps it was taking to register with the SEC, Adit Ventures Management did not register or correct its filings in 2022 claiming the exemption.

148. A year later in March 2023, Adit Ventures Management filed a Form ADV with the SEC again falsely claiming that it qualified for the exemption.

149. Adit Ventures Management did not register as an investment adviser until March 2024.

## FIRST CLAIM FOR RELIEF
### Violations of Securities Act Section 17(a)
### (All Defendants)

150.    The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 149.

151.    Defendants, directly or indirectly, singly or in concert, in the offer or sale of securities and by the use of the means or instruments of transportation or communication in interstate commerce or the mails, (1) knowingly or recklessly have employed one or more devices, schemes or artifices to defraud, (2) knowingly, recklessly, or negligently have obtained money or property by means of one or more untrue statements of a material fact or omissions of a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and/or (3) knowingly, recklessly, or negligently have engaged in one or more transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

152.    Because of the foregoing, Defendants, directly or indirectly, singly or in concert, have violated and, unless enjoined, will again violate Securities Act Section 17(a) [15 U.S.C. § 77q(a)].

## SECOND CLAIM FOR RELIEF
### Violations of Exchange Act Section 10(b) and Rule 10b-5 Thereunder
### (All Defendants)

153.    The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 149.

154.    Defendants, directly or indirectly, singly or in concert, in connection with the purchase or sale of securities and by the use of means or instrumentalities

of interstate commerce, or the mails, or the facilities of a national securities exchange, knowingly or recklessly have (i) employed one or more devices, schemes, or artifices to defraud, (ii) made one or more untrue statements of a material fact or omitted to state one or more material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and/or (iii) engaged in one or more acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

155.    Because of the foregoing, Defendants, directly or indirectly, singly or in concert, have violated and, unless enjoined, will again violate Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

### THIRD CLAIM FOR RELIEF
### Violations of Advisers Act Sections 206(1) and (2)
### (All Defendants)

156.    The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 149.

157.    At all relevant times, Defendants were investment advisers under Advisers Act Section 202(a)(11) [15 U.S.C. § 80b-2(a)(11)].

158.    By engaging in the conduct alleged above, Defendants, directly or indirectly, singly or in concert with others, through the use of the mails or any means or instrumentality of interstate commerce have: (i) knowingly or recklessly employed devices, schemes, and artifices to defraud any client or prospective client, and/or (ii) knowingly, recklessly, or negligently engaged in one or more transactions, practices, and courses of business which operated or would operate as a fraud or deceit upon any client or prospective client.

42

159.    With regard to the violations of Section 206(1) of the Advisers Act, Defendants engaged in the conduct knowingly or with severe recklessness. With regard to the violations of Section 206(2), Defendants engaged in the conduct at least negligently.

160.    Because of the foregoing, Defendants, directly or indirectly, singly or in concert, have violated and, unless enjoined, will again violate Advisers Act Sections 206(1) and (2) [15 U.S.C. §§ 80b-6(1) and 80b-6(2)].

**FOURTH CLAIM FOR RELIEF**
**Violations of Advisers Act Section 206(3)**
**(General Partners)**

161.    The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 149.

162.    At all relevant times, General Partners were investment advisers under Advisers Act Section 202(a)(11) [15 U.S.C. § 80b-2(a)(11)].

163.    Defendant General Partners, by use of the mails or any means or instrumentality of interstate commerce, directly or indirectly have knowingly sold securities to or purchased securities from a client, or acted as broker for a person other than such client, knowingly to effect any sale or purchase of any security for the account of such client, without disclosing to such client in writing before the completion of such transaction the capacity in which he is acting and obtaining the consent of the client to such transaction.

164.    Because of the foregoing, Defendant General Partners, directly or indirectly, singly or in concert, have violated and, unless enjoined, will again violate Advisers Act Section 206(3) [15 U.S.C. § 80b-6(3)].

43

**FIFTH CLAIM FOR RELIEF**
**Violations of Advisers Act Section 206(4) and Rule 206(4)-8 Thereunder**
**(All Defendants)**

165.    The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 149.

166.    At all relevant times, Defendants were investment advisers, under Advisers Act Section 202(a)(11) [15 U.S.C. § 80b-2(a)(11)], to a pooled investment vehicle, as defined in Rule 206(4)-8(b) [17 C.F.R. § 275.206(4)-8(b)].

167.    Defendants knowingly, recklessly, or negligently (i) made one or more untrue statements of a material fact or omitted to state one or more material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, to any investor or prospective investor in the pooled investment vehicle, and/or (ii) engaged in one or more acts, practices, or courses of business that were fraudulent, deceptive, or manipulative, with respect to any investor or prospective investor in the pooled investment vehicle.

168.    Because of the foregoing, Defendants, directly or indirectly, singly or in concert, have violated and, unless enjoined, will again violate Advisers Act Section 206(4) [15 U.S.C. § 80b-6(4)] and Rule 206(4)-8(a)(2) thereunder [17 C.F.R. § 275.206(4)-8(a)(2)].

**SIXTH CLAIM FOR RELIEF**
**Violations of Section 203(a) of the Advisers Act**
**(Adit Ventures Management)**

169.    The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 149.

170.    Section 203 of the Advisers Act [15 U.S.C. § 80b-3] requires investment advisers who engage in interstate commerce to register with the SEC unless an exception applies.

171.    From April 2016 through March 2024, Adit Ventures Management failed to register as required, instead claiming that it was exempt under the venture capital exemption (Advisers Act Section 203(*l*) and Rule 203(*l*)-1) [15 U.S.C. § 80b-3(*l*) and 17 C.F.R. § 275.203(*l*)-1]. Adit Ventures Management did not meet the qualifications of the venture capital exemption as it claimed, yet it continued to operate as an investment adviser engaged in interstate commerce.

172.    Because of the foregoing, Adit Ventures Management violated and, unless enjoined, will continue to violate Section 203(a) of the Advisers Act [15 U.S.C. § 80b-3(a)].

## SEVENTH CLAIM FOR RELIEF
### Control Person Liability for Violations of
### Exchange Act Section 10(b) and Rule 10b-5
### (Munson)

173.    The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 149.

174.    As alleged above, Adit Ventures Management and the General Partners violated Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

175.    At all relevant times, Munson was a control person of Adit Ventures Management and the General Partners for purposes of Section 20(a) of the Exchange Act [15 U.S.C. § 78t(a)].

45

176.    At all relevant times, Munson exercised power and control over Adit Ventures Management and the General Partners, including by managing and directing those entities, and by directing and participating in the acts constituting Adit Ventures Management's and the General Partners' violations of the securities laws.

177.    Because of the foregoing, Munson is liable as a control person under Section 20(a) of the Exchange Act [15 U.S.C. § 78t(a)] for Adit Ventures Management's and the General Partners' violations of Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

**EIGHTH CLAIM FOR RELIEF**
**Aiding and Abetting Violations of Adviser Act Section 206(3)**
**(Adit Ventures Management and Munson)**

178.    The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 149.

179.    As alleged above, at all relevant times, General Partners were investment advisers under Advisers Act Section 202(a)(11) [15 U.S.C. § 80b-2(a)(11)]. Defendant General Partners, by use of the mails or any means or instrumentality of interstate commerce, directly or indirectly have knowingly sold securities to or purchased securities from a client, or acted as broker for a person other than such client, knowingly to effect any sale or purchase of any security for the account of such client, without disclosing to such client in writing before the completion of such transaction the capacity in which he is acting and obtaining the consent of the client to such transaction.

46

180. Because of the foregoing, Defendant General Partners, directly or indirectly, singly or in concert, have violated and, unless enjoined, will again violate Advisers Act Section 206(3) [15 U.S.C. § 80b-6(3)].

181. Defendants Adit Ventures Management and Munson knowingly or recklessly provided substantial assistance to the General Partners with respect to their violations of Advisers Act Section 206(3).

182. Because of the foregoing, Defendants Adit Ventures Management and Munson are liable under Advisers Act Section 209(f) [15 U.S.C. § 80b-9(f)].

## TOLLING OF STATUTE OF LIMITATIONS

183. Munson and Adit Ventures Management agreed to toll any statute of limitations applicable to the claims alleged here during the period from January 26, 2024, through September 7, 2026. The General Partners agreed to toll any statute of limitations applicable to the claims alleged here during the period from March 4, 2026, through September 7, 2026.

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that this Court:

A. In a form consistent with Rule 65(d) of the Federal Rules of Civil Procedure, permanently restraining and enjoining (1) Defendants, their agents, servants, employees, and attorneys and all persons in active concert or participation with any of them from violating, directly or indirectly, Securities Act Section 17(a) [15 U.S.C. § 77q(a)]; Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5]; Advisers Act Sections 206(1), 206(2), 206(3), and 206(4) [15

U.S.C. §§ 80b-6(1)-(4)] and Rule 206(4)-8 thereunder [17 C.F.R. § 275.206(4)-8]; and (2) Adit Ventures Management, its agents, servants, employees, and attorneys and all persons in active concert or participation with it from violating, directly or indirectly, Advisers Act Section 203(a) [15 U.S.C. § 80b-3(a)];

B. Ordering Defendants to disgorge, on a joint and several basis as to Munson and Adit Ventures Management, Munson and Adit Ventures I, Munson and Adit Ventures II, and Munson and Adit Ventures III, the ill-gotten gains they received because of the alleged violations and to pay prejudgment interest pursuant to Exchange Act Sections 21(d)(3), 21(d)(5), and 21(d)(7) [15 U.S.C. §§ 78u(d)(3), 78u(d)(5), and 78u(d)(7)];

C. Ordering Defendants to pay civil monetary penalties under Securities Act Section 20(d) [15 U.S.C. § 77t(d)], Exchange Act Section 21(d)(3) [15 U.S.C. § 78u(d)(3)], and Advisers Act Section 209(e) [15 U.S.C. § 80b-9(e)];

D. Granting such other and further relief as this Court may deem equitable and proper.

## JURY DEMAND

The Commission demands a jury in this matter for all claims so triable.

48

Dated: August 10, 2026                  Respectfully submitted,


By: /s/   Daniel J. Ball
Zachary A. Avallone (*pro hac vice* pending)
Daniel J. Ball (*pro hac vice* pending)
SECURITIES AND EXCHANGE
COMMISSION
100 F Street, N.E.
Washington, D.C. 20549
(202) 551-4479 (Avallone)
(202) 551-5987 (Ball)
AvalloneZ@sec.gov
BallDan@sec.gov

*Attorneys for Plaintiff*
*Securities and Exchange Commission*